## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Floridalma Escobar,                                    Civil No. 05-2147 (DWF/SRN)

                Plaintiff,

v.                                                     **MEMORANDUM**
                                                       **OPINION AND ORDER**

Swift and Company,

                Defendant.

---

James H. Kaster, Esq., Jessica J. Clay, Esq., and Adam A. Gillette, Esq., Nichols Kaster & Anderson, PLLP, counsel for Plaintiff.

Donald W. Selzer, Jr., Esq. and Jodie F. Friedman, Esq., Littler Mendelson, PC, and Stuart B. Johnston, Jr., Esq., Vinson & Elkins, LLP, counsel for Defendant.

---

## INTRODUCTION

Plaintiff Floridalma Escobar brought suit against her former employer alleging that she was discriminated against on the basis of sex, race, and reprisal in violation of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e ("Title VII"), and the Minnesota Human Rights Act ("MHRA"), and on the basis of race, color, and national origin in violation of 42 U.S.C. § 1981. The matter is currently before the Court on Plaintiff's Motion for Partial Summary Judgment on the sexual harassment claims under Title VII and the MHRA (Counts I and II of the Complaint) and on Defendant's Motion for Summary Judgment on the sexual harassment and reprisal claims under Title VII and

MHRA (Counts I, II, V, and VI of the Complaint).  For the reasons stated below, both motions are denied in their entirety.[1]

## BACKGROUND

Plaintiff Floridalma Escobar is a native woman of Guatemala and is of Hispanic origin.  Defendant Swift and Company operates a pork processing plant in Worthington, Minnesota.  Swift hired Escobar to work in the kill department in March 2002,[2] which involved cheeking heads/trimming cheeks.  Escobar's supervisor was Scott Zamzow.

During her employment, Escobar asserts that she observed Zamzow touch female employees' buttocks, rub up against women, simulate sexual movements while standing close behind women, and make sexual comments to women.  Escobar also asserts that Zamzow personally sexually harassed her.  Specifically, Escobar claims that (1) after she accidentally splashed water from the sink on Zamzow, he stood very close behind her and stated he wanted to take a shower with her; (2) Zamzow stated that he wanted to have an affair with her; (3) when she asked Zamzow for a pair of gloves, he told her she was a lucky employee because he liked her; (4) Zamzow would come up close behind her on the line and rub the front of his body against her back-side; (5) Zamzow made jokes and comments about male genitals in front of her; and (6) Zamzow carved meat into the

---

[1]     Plaintiff withdrew Counts III and IV of the Complaint relating to race discrimination.  (*See* Doc. No. 39 at 1.)  Also, as discussed in her Memorandum and at oral argument, Plaintiff asserts that her harassment and retaliation claims are her only remaining claims.  Therefore, Plaintiff has also withdrawn Count VII of the Complaint (Section 1981 claim).

[2]     Escobar previously worked at Swift from October 1999 through October 2000, when she voluntarily resigned.  Swift rehired her in March 2002.

shape of a penis on two occasions and showed it to Escobar and others.  Escobar claims that she made it clear to Zamzow that his actions were not welcome.

Escobar asserts that many of the women went along with Zamzow's behavior and that when they did, they would receive benefits or special treatment from Zamzow, including being given more bathroom breaks and more gloves, allowing them to wear jewelry, and not requiring them to rotate to the more strenuous jobs.  Escobar contends that because she refused Zamzow's advances, he treated her differently by having her start the day in the cheeking-heads position more often than others,[3] by not allowing her as many breaks, and by not giving her any of the benefits other employee's enjoyed.

Swift has a non-discrimination and sexual harassment policy that explains that employees are to report harassment to their supervisor, or if the harassment involved the supervisor, to Human Resources.  The policy also states that it is management personnel's responsibility to ensure a sexual-harassment-free working environment.  Escobar was aware of this policy.

---

[3]     Cheeking heads involved cutting and removing the hog cheeks out of the head with a knife.  Trimming cheeks involved trimming the fat off of those cheeks.  People assigned to remove cheeks stood across from the people who were assigned to trim the cheeks, and once a cheek was removed, the person would toss the cheek across the table to have the cheek trimmed.  The job of cheeking heads was known to be the most difficult job on the kill floor because of the stress placed on an employee's wrist by the repetitive grasping and twisting motion needed to cut the cheek around the hog's teeth.  For ergonomic reasons, it was company policy to have the employees on the kill floor rotate between cheeking heads and trimming cheeks.  If a person started the day cheeking heads, they would end up spending five to six hours of an eight-hour day doing so, which left two to three hours to trim cheeks.  As supervisor, Zamzow controlled the rotation of employees between the two positions.

The parties dispute when Escobar reported the sexual harassment to Human Resources. Swift contends it first learned of Escobar's sexual harassment allegations from the Union[4] after Escobar left the company in August 2004. Swift asserts prior to that, Escobar had only complained to Human Resources about the lack of rotation in the job positions.

Escobar contends, on the other hand, that she complained to Randy Bruinsma, Swift's Human Resources manager, in January 2003, both about the differential treatment and Zamzow's harassment. Escobar asserts that she specifically complained that she was not being rotated from pulling cheeks because she did not go along with Zamzow's harassment. Escobar contends that Bruinsma responded by saying that she could leave the company. At this point, someone at Swift spoke to Zamzow about the issue, but he was not disciplined.

Between January and September 2003, Escobar contends that she complained to Human Resources approximately three more times about Zamzow's harassment and his refusal to rotate her. Bruinsma and/or Darin Rehnelt, the chief walking steward for the Union, who was also present at the meetings, told the supervisors that they had to rotate the employees so that they would not start in the cheeking-heads position every day.

---

[4]     The United Food and Commercial Workers Union, Local 1161, represents the employees at Swift.

In late September 2003, Escobar complained to the Union president, Michael

Potter, about feeling harassed, Zamzow's joking, and unequal treatment.[5]  Potter advised

Rehnelt to discuss the issue with Zamzow.  Rehnelt told Zamzow that Escobar thought he

liked her.  Zamzow's response was that he would stand on the other side of the table from

Escobar from now on.  Thereafter, from September through November 2003, Escobar

admits that the rotation schedule improved.

Escobar contends, however, that Zamzow's harassment and unequal treatment in

rotation started again in late November 2003 and that she complained to Human

Resources again.  At that meeting, Zamzow stated he would begin writing down where

each employee started each day so that he could keep track of the rotation.

In May 2004, Escobar applied for a different position in the kill department.  Swift

awards positions according to seniority within a division.  At that time, Escobar was the

second most senior employee to sign up for the position, with the most senior employee

being Sylvia Sosa, a Hispanic female, whom Swift offered the position to.  Escobar

contends that when Sosa decided not to accept the position, Swift should have offered the

position to Escobar, but Swift did not offer Escobar the position; instead, it re-posted that

position in July 2004.  Escobar claims that this is evidence of Swift retaliating against her

for complaining about Zamzow's harassment and unequal treatment.

In response, Swift asserts that Escobar has the facts wrong.  Swift contends that

after being offered the position, Sosa went forward with training for the position and later

---

[5]     Swift asserts that the Union did not inform Human Resources of this complaint
during Escobar's employment.

transferred into the position and remained there until her resignation on July 18, 2004. Swift asserts that the position that was posted on July 1 was for a separate vacancy, which Escobar did not sign up for.  Swift then posted the vacancy that resulted from Sosa's departure on July 29, which Escobar also did not sign up for.

While still in her same position on the head table, Escobar asserts that she complained about Zamzow's behavior and lack of rotation to Rehnelt again in July 2004. Escobar asserts that Rehnelt's response was to say that the supervisor knew he had to rotate employees.

Then, on August 25, 2004, after arriving to work and being assigned to cheek heads when Escobar believed it was her rotation to start the day in the trimming cheeks position, she refused to start work and complained to Zamzow.  In response, Zamzow brought Escobar to Human Resources and told them that she was being insubordinate; Escobar received a verbal warning.

Escobar asserts that when she was brought to Human Resources, she reported to Bruinsma that Zamzow had harassed her and would not rotate her because she did not go along with his harassment.  Escobar also asserts that she asked Bruinsma for three days off work to file a formal complaint and to seek a legal remedy.  Swift contends that Escobar did not express concerns of sexual harassment at this meeting and that the request to take three days off was to attend to personal matters.

Regardless of this factual dispute, Bruinsma gave Escobar a time-off slip and told her that she had to get the leave request approved by her supervisor, Zamzow.  Escobar completed the time off request form and handed it to Zamzow.  Escobar contends that

Zamzow ignored her and would not accept the request.  She then left Swift and did not return.

On August 27, 2004, Escobar met with the Union president to fill out a formal sexual harassment/discrimination complaint against Zamzow, which she filed with the Department of Labor, and which was forwarded to the Equal Employment Opportunity Commission.  Swift contends that this was the first time that it learned of Escobar's complaint of sexual harassment.

On August 31, 2004, Swift sent Escobar a letter indicating that they considered her to have voluntarily quit because she failed to properly notify the company of her absence for three consecutive days.  Thereafter, Escobar went to speak to Bruinsma, where it was confirmed that Swift considered Escobar's employment terminated.  Bruinsma invited Escobar to give more information about her reasons for leaving, and Escobar declined to do so.

In September 2004, Swift investigated Escobar's harassment allegations by interviewing six individuals who worked with Escobar at her table, asking them each six questions.  The questions related to the employee's length of employment and position, whether they believed their supervisor treated the employees all the same and fairly, whether they had ever seen their supervisor or any supervisor carve meat or fat to look like the private body part of a man, and whether they had anything they wanted to say about how it was to work there.  Hamilton, Swift's Human Resources director, concluded

that none of these employees corroborated Escobar's allegations and therefore there was no evidence supporting the claims.[6]

Thereafter, Escobar attended a grievance meeting where Hamilton asked Escobar whether she had reported Zamzow's harassment prior to her leaving on August 25, 2004. Escobar contends that she explained that she had reported it on more than one occasion. Swift, on the other hand, contends that Escobar admitted at this meeting that the first time she advised Swift of her sexual harassment allegations was after she had left the job. Regardless, Swift offered to reinstate Escobar with her choice of department, shift, and position. Escobar declined.

On October 25, 2004, Escobar filed her discrimination claim with the EEOC. Then, in November 2004, in conjunction with Escobar's unemployment compensation appeal, Swift received a witness statement that purportedly corroborated some of Escobar's allegations. Swift conducted another investigation into Escobar's harassment allegations by interviewing more employees. The same questions were asked as those asked in the prior investigation, with the additional question of whether the employee had ever seen Zamzow touch or rub against any female employee. Again, no one confirmed Escobar's allegations. At that point, Swift gave Zamzow a warning and required him to review the company's sexual harassment policy.

On May 11, 2005, the EEOC issued a determination of probable cause regarding Escobar's claims. The determination states that "the evidence obtained during the

---

[6]     Zamzow also denied all of the allegations against him.

investigation showed that [Defendant] discriminated against [Escobar] because of her gender/female, race/national origin, Hispanic, and in reprisal for opposing discrimination. She was denied rotation and was subjected to sexual harassment and constructive discharge." (Affidavit of Jessica J. Clay in support of Plaintiff's Motion for Partial Affirmative Summary Judgment, ¶ 3, Exhibit 20 at p. 2.)

Approximately three months later, Swift's regional Human Resources Director, Tony Harris, conducted another investigation.  This time, Harris determined that there was witness support for Escobar's allegations regarding Zamzow's harassment and unfair treatment.[7]  Swift then terminated Zamzow.

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

---

[7]    All of the incidents uncovered in this investigation occurred prior to Swift's first two investigations.

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.      Vicarious Liability for Sexual Harassment

In Counts I and II, Escobar argues that Swift is vicariously liable for both quid pro quo harassment, and for a hostile work environment that amounted to sexual harassment. Title VII and the MHRA prohibit both. *See* Title 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363.08. The courts of the Eighth Circuit have consistently analyzed sexual harassment claims under the MHRA as analogous to claims under Title VII. *See Finley v. Empiregas, Inc. of Potosi*, 975 F.2d 467, 473 (8th Cir. 1992). Thus, the Court's analysis shall apply to Escobar's claims under both statutes.

An employer is subject to vicarious liability for a supervisor's sexual harassment of an employee when a tangible employment action is taken against the employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). If no tangible employment action is taken against the employee, the employer will still be vicariously liable to the employee for an actionable hostile environment created by a supervisor, unless the employer raises and satisfies the

two-part *Ellerth/Faragher* affirmative defense.  *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

## A.     Quid Pro Quo Harassment

A prima facie case of quid pro quo sexual harassment is established if a plaintiff shows that:  (1) she was a member of a protected class; (2) she was subject to unwelcome sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits, or her refusal to submit resulted in a tangible job detriment.  *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir. 1995).

The parties do not dispute that Escobar has met the first two requirements.[8]  Swift argues, however, that the latter two requirements have not been met.

---

[8]     Regarding the second requirement, harassing conduct is considered unwelcome if it was "uninvited and offensive."  *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 962 (8th Cir. 1993).  The proper inquiry is whether the plaintiff indicated by her conduct that the alleged harassment was unwelcome.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).  Escobar contends that she has met the second requirement because she affirmatively told Zamzow to stop his behavior and complained on numerous occasions.  While Swift does contest when and how many times Escobar complained, it does not contest that Escobar found Zamzow's conduct unwelcome.

Even so, Swift asserts that there is no evidence that the other women found Zamzow's conduct unwelcome.  While that dispute is irrelevant here, it is worth noting Escobar's assertions that (1) Zamzow stated in one of the meetings that Escobar's co-workers would not support her or make complaints against Zamzow because they did not have legal papers to work in the United States, and (2) as illegal immigrants, the co-workers feared that they would be fired.  In light of the recent raids of the Swift plants and the resulting charges and deportations, these fears were likely well grounded.

### i.     Harassment based on sex

Swift asserts that Zamzow's conduct "amounts to friendly consensual banter or horseplay between Zamzow and some of his employees (both male and female)." (Defendant's S.J. Memo., at 19.)  Swift contends that because Zamzow's banter was also directed toward males and because some of the males spent the same amount of time as Escobar did on the cheek-heads rotation, Escobar cannot prove that the harassment was based on sex.  Swift also asserts that there were non-sex-based reasons for some of the favorable treatment that Escobar complains about.  For example, some of the employees had medical issues requiring differential treatment, and some of the rotation issues stemmed from employees' absence from work for illness, medical issues, or vacations.

In response, Escobar asserts that there are genuine issues of material fact with respect to whether the women were the primary targets of Zamzow's harassment. (Plaintiff's Opposition Memo., at 14.)   While Escobar concedes that in one isolated instance, Zamzow engaged in harassing behavior with a male employee by touching his buttocks, Escobar claims that men in her area did not engage in the harassment with Zamzow and were not rotated regardless of their acquiescence with Zamzow's behavior.

Escobar's claim is not defeated simply because Zamzow told sexual jokes and made sexual comments in the presence of males or because Zamzow touched a male's buttocks on one occasion.  The proper inquiry is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Quick v. Donaldson, Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (quotations omitted).  Escobar has provided evidence that she had to work the

cheek-heads position more than others, which is a position that is known to be the most difficult, and for which Swift has a rotation policy to address its difficult nature and ergonomic concerns.  In addition, viewing the evidence in the light most favorable to Escobar, there is evidence indicating that females were the primary targets of the harassment:  Escobar asserts Zamzow touched females' back-sides, rubbed his front-side up against her back-side while on the line, and made sexual comments to her about liking her or wanting to shower with her.  While Zamzow denies these occurrences, neither his nor Escobar's credibility is to be weighed by the Court at this stage in the litigation.

Further, a party would be hard-pressed to persuade the Court that the "because of sex" factor is not implicated when there is evidence of a supervising official's behavior consisting of rubbing their front-side up against female individuals who are working in a subordinate position.  A reasonable person could find that such exposure to such conditions was disadvantageous.  *See id*. ("Evidence that members of one sex were the primary targets of the harassment is sufficient to show that the conduct was gender based for purposes of summary judgment.") (citing *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269-70 (8th Cir. 1993)).  On this record, at a minimum, genuine issues of material fact exist to survive summary judgment as to whether the alleged harassment was gender based.

### ii.    Tangible employment action

"Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  *Ellerth*, 524 U.S. at 762.  "A tangible employment action constitutes a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or decision causing a significant change in benefits." *Id*. at 761; *see also Crady v. Liberty Nat. Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").

Escobar claims that because of her refusal to engage in Zamzow's sexual harassment, she incurred tangible employment actions in the form of refusing to rotate her to the less difficult job of trimming cheeks, denying her bathroom breaks and gloves, not allowing her to wear jewelry, and denying her a job transfer she signed up for.  Swift maintains that a tangible employment action did not occur because Escobar's duties and responsibilities did not change, only the length of time for which Escobar had to perform a certain duty did.  Even so, Swift concedes that there is an underlying "factual dispute in regard to this claim" because Zamzow and others agree that Zamzow did not do anything improper in regard to rotation, bathroom breaks, and providing gloves.  (Defendant's Opposition Memo., at 27.)

The Court finds that Swift's denial of the job transfer is not a tangible employment action because the undisputed evidence shows that Swift legitimately awarded the May job promotion to the most senior employee and that Escobar did not sign up for the other postings.  Viewing the remaining evidence in the light most favorable to Escobar shows, at a minimum, that Swift ignored Escobar's repeated complaints and therefore creates a

genuine issue of material fact as to whether the other alleged tangible employment actions materially and significantly disadvantaged her employment. *See Baker v. John Morrell & Co.*, 220 F. Supp. 2d 1000, 1014 (N.D. Iowa 2002) (stating that the denial of equal access to bathroom facilities has been found to alter the terms and conditions of a plaintiff's employment).

In addition, there is also a genuine issue as to whether Escobar was constructively discharged. Constructive discharge constitutes a tangible employment action that prevents an employer from utilizing the *Ellerth/Faragher* affirmative defense. *Jackson v. Ark. Dep't of Educ.*, 272 F.3d 1020, 1026 (8th Cir. 2001). "A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate her employment." *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000). An employee must provide the employer a reasonable opportunity to resolve the "intolerable condition" before terminating her employment. *Id.* at 617. If a reasonable opportunity is granted and no remedial action is taken, or the employee reasonably believes that there is no chance of fair treatment, then the employee has been constructively discharged. *Id.*; *see also Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1008 (8th Cir. 2000) (stating that "if an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge"). An employee's dissatisfaction with working conditions normally does not establish a constructive discharge. *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 496 (8th Cir. 1996).

Viewing the evidence in the light most favorable to Escobar, the Court finds that a reasonable jury could believe her version of the facts and could believe that Zamzow's actions—the lewd jokes and acts, the rubbing, the sexual gestures, the denial of bathroom breaks, and the official action of refusing to rotate Escobar fairly to and from the cheeking-heads position, which is undisputely the most difficult position—made Escobar's working conditions intolerable.  Also, if Escobar's version of the facts are believed, then the evidence would show that even though Escobar complained about Zamzow's harassment as early as January 2003 and several times thereafter, the unfair treatment continued—sometimes intermittently but nevertheless continued—up until the day she left the company in August 2004.  Further, a reasonable person could find that, after being told by the Human Resources manager that if she did not like the situation she should quit, after being sent to Zamzow—her harasser—to seek approval for time off, and after knowing that the employer knows of the history and the problems she had been having with Zamzow, Escobar could have reasonably believed that there was no chance of fair treatment in the future.

On the other hand, viewing the evidence in the light most favorable to Swift, a reasonable jury could believe its version of the facts.  If so, then Swift would not have been notified of the harassment until after Escobar walked off the job in August 2004.  And even then, Escobar refused to cooperate with Swift in an attempt to resolve the situation.  In light of these facts, Swift may not have been given a reasonable opportunity to resolve the "unreasonable working conditions" and therefore may not have constructively discharged Escobar.

Therefore, the issue of constructive discharge hinges on credibility determinations for the trier of fact and not the Court, and the parties have generated genuine issues of material fact to survive summary judgment.  Because there is conflicting evidence in the record as to two of the four quid pro quo sexual harassment claim elements, the Court denies both parties' summary judgment motions with respect to Escobar's Title VII and MHRA quid pro quo claims.

### B.    Hostile Work Environment

A plaintiff may establish a Title VII violation by proving that discrimination based on sex has created a hostile or abusive work environment.  *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (quoting *Meritor Sav. Bank*, 477 U.S. at 66).  A *prima facie* case of such sexual harassment requires a showing that:  (1) the plaintiff belongs to a protected class; (2) the plaintiff was subject to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of plaintiff's employment.  *Ogden*, 214 F.3d at 1006 n.9.

To be actionable, the conduct must have been "sufficiently severe or pervasive" to alter the conditions of the plaintiff's employment and create an abusive working environment.  *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  The "conduct must be extreme and not merely rude or unpleasant[.]"  *Alagna v. Smithville R-II School District*, 324 F.3d 975, 980 (8th Cir. 2003).  To assess whether the harassment is sufficiently severe or pervasive, the Court must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 (8th Cir. 1998) (quoting Harris, 510 U.S. at 23).  The plaintiff must show both that the offending conduct created an objectively hostile environment and that she subjectively perceived her working conditions as abusive.  *Hathaway*, 132 F.3d at 1221.  However, once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury.  *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998).

Similar to the quid pro quo harassment claim, Swift does not dispute that the first two elements of the *prima facie* case for hostile environment are met.  Swift does dispute that Escobar has established the third and fourth requirements.  Specifically, Swift denies that the treatment Escobar experienced was because of her sex or that it rose to the level of "severe or pervasive" so as to have adversely affected the condition of her employment.

### i.      Harassment based on sex

With respect to the third requirement that the harassment be based on sex, the Court finds, for the same reasons that it did above in section II.A.i., that on this record, genuine issues of material fact exist as to whether the alleged harassment was gender based.

### ii.      Severe or pervasive

The fourth element requires that the harassment must have been sufficiently severe or pervasive to alter the conditions affected a term, condition, or privilege of plaintiff's

employment. In determining whether this element is met, the Court must consider the totality of the circumstances. *E.g.*, *Harris*, 510 U.S. at 23. Also, the Court should recognize that "a work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." *Hathaway*, 132 F.3d at 1222 (quotations omitted). "A discriminatorily abusive work environment may exist where the harassment caused economic injury, affected the employee's psychological well-being, detracted from job performance, discouraged an employee from remaining on the job, or kept the employee from advancing in his or her career." *Quick*, 90 F.3d at 1378.

Escobar admits that there are genuine issues of material fact regarding this issue. (Plaintiff's Opposition Memo., at 14.) Swift also admits that Escobar's claim of severe and pervasive harassment is the subject of a factual dispute because Zamzow and others deny that Zamzow engaged in the conduct or harassment as alleged. (Defendant's Opposition Memo., at 16.) Additionally, Swift argues that even taking Escobar's allegations as true, a reasonable person would not consider Zamzow's behavior as objectionable because the joking behavior between Zamzow and others was "consensual" and that the other female employees did not consider Zamzow's behavior as harassing.[9] Swift admits that Zamzow's behavior was "boorish, chauvinistic, and

---

[9] Again, in light of recent events in Worthington, and especially in light of the assertions in the Complaint that Zamzow believed "employees would not make complaints against him for fear of losing their jobs because they were illegal" and that "Zamzow told Escobar that he had no problem yelling at her in front of her co-workers because they were all 'illegal' and could not do or say anything against him" (Doc. No. 1,

(Footnote Continued on Next Page)

decidedly immature" but nevertheless contends that this conduct does not rise to the level of severe and pervasive conduct under the case law.

Having examined each of the alleged incidents individually and as a whole, and viewing the evidence in the light most favorable to Escobar, the Court concludes that the behavior alleged by Escobar does constitute actionable sexual harassment under Title VII and the MHRA. Viewing Escobar's contentions as true, Zamzow asked her if she was married, asked if she would take a shower with him, made repeated sexual jokes regarding male genitals, rubbed his body against hers, and showed her meat carved in the shape of a penis. The Court rejects the contention by Swift that the unprofessional and lewd behavior exhibited by Zamzow "amounts to friendly consensual banter or horseplay." The sexual touching is particularly troublesome to the Court, especially in light of the sexual innuendos made in Escobar's presence over a continuous period of time. Her attempts to stop this harassment through reporting to Human Resources or the Union were to no avail other than a three-month reprieve. The Court finds that the facts as presented are sufficient for the jury to conclude that Escobar was subjected to sexual harassment sufficiently severe or pervasive to establish a hostile work environment.

---

(Footnote Continued From Previous Page)
at ¶ 30), the Court finds it hard to believe that all of the women that Zamzow "joked" or "played" with considered his actions truly consensual. It is more likely that with the risk of deportation looming over their heads, they chose not to object to Zamzow's conduct in order to keep their jobs.

### iii.    *Ellerth/Faragher* defense

As noted above, if no tangible employment action is taken against the employee, the employer will not be vicariously liable to the employee for an actionable hostile environment created by a supervisor if the employer raises and satisfies the two-part *Ellerth/Faragher* affirmative defense.  *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  The defense requires that:  (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.  *Id.*  If the employee did not report the harassment but can point to "specific facts [that] would indicate that harassment by coworkers is widely pervasive, such facts could support an inference of constructive knowledge by the employer."  *Ciszewski v. Engineered Polymers Corp.*, 179 F. Supp. 2d 1072, 1097 (D. Minn. 2001) (quotations omitted).

Swift asserts that it has satisfied the defense here.  However, the Court finds that Escobar has raised fact issues regarding whether Swift acted promptly to address the harassment, especially in light of Escobar's assertions that she complained to Human Resources and the Union on several occasions beginning in January 2003.  Conversely, there are factual disputes surrounding whether Escobar took advantage of the corrective opportunities available to her prior to her August departure, whether Swift responded to Escobar's complaints in an effective manner, and whether Zamzow's harassment was

pervasive enough that the company was aware of the harassment.[10]   Therefore, the Court

finds that there are fact issues permeating Swift's alleged defense and denies Swift's

summary judgment motion with respect to this defense.

## III.   Retaliation

"Retaliation," also known as "reprisal," is the unlawful discrimination by an

employer against an employee for his/her opposition to or use of process to address an

employment practice deemed unlawful under the relevant statute.  It is undisputed that

Escobar has not produced any direct evidence as to her retaliation claim.  "In the absence

of direct evidence of retaliation in violation of Title VII, the Court applies the

burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973)."

*Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000).

In order to prevail on her claim, Escobar must establish a *prima facie* case of

retaliation, showing:  (1) she engaged in protected activity; (2) she subsequently suffered

an adverse employment action; and (3) a causal connection exists between the adverse

employment action and the protected activity.  *Id.*; *Schoffstall v. Henderson*, 223 F.3d

818, 826 (8th Cir. 2000).  The Eighth Circuit has held that "actions short of termination

may constitute adverse actions within the meaning of the statute."  *Smith v. St. Louis*

*Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997); *see also Kim v. Nash Finch Co.*, 123 F.3d

1046, 1060 (8th Cir. 1997) (stating that sufficiently adverse actions include discharge,

---

[10]     While Zamzow denies the allegations against him, there is evidence that Zamzow
partook in some of the alleged activities and like activities and that some employees
considered Zamzow a pervert.

reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, and "papering" of an employee's file with negative reports and reprimands); *Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir. 1997) (finding that retaliation took the form of transfer to a less desirable position because that position offered little opportunity for salary or advancement).

If Escobar is successful in establishing a *prima facie* case, then the burden shifts to Swift, who is required to provide evidence of a valid, non-discriminatory reason for the alleged discriminatory conduct. *Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997). If Swift produces such evidence, then the burden shifts back to Escobar requiring her to prove intentional discrimination. *Id.* Escobar is not required to present new evidence at this stage. Instead, it is sufficient for Escobar to rely on the evidence presented to establish the prima facie case coupled with the claim that Swift's reason is mere pretext. *Id.* at 836-37; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000).

Escobar alleges she engaged in protected activity when she repeatedly reported harassment to Human Resources at Swift and the Union. Swift does not dispute that Escobar engaged in statutorily protected activity. Escobar claims that adverse employment action occurred when, in retaliation for her numerous complaints, she was (1) required to work the cheeking-heads position more than others and (2) forced to turn in her form and seek approval for time off from Zamzow, the person whom she alleged was harassing her, both of which culminated in a constructive discharge. And Escobar asserts that there is a causal connection between the protected activity and the adverse

employment actions because (1) she was brought to Human Resources each time she complained to Zamzow[11]; (2) Bruinsma was angry and yelled at her at least one time when she reported the harassment; and (3) immediately after reporting Zamzow's harassment in August 2004, she was forced to confront Zamzow—her harasser—with her time-off request.

As to Escobar's first allegation of retaliation, while it is true, as Swift asserts and as Escobar admitted in her deposition, that the situation regarding rotation did improve for three months after she talked to Human Resources in September 2003, this does not negate the possibility that she was being retaliated against during the January through September 2003 months, or in the months after November 2003, when Escobar claims the rotation worsened again.  A reasonable jury could find that in retaliation for complaining to Human Resources, Zamzow assigned Escobar disproportionately to the cheeking-heads position—a position necessitating a company policy to rotate employees through because of the difficult nature of the position's duties.  *See Ross v. Douglas County*, 234 F.3d 391, 395 (8th Cir. 2000) (finding that assigning employee full-time to a position that employees were routinely rotated through because of the stressful nature of

---

[11]    Escobar asserts that she reported Zamzow's behavior to Human Resources on several occasions from January through September 2003 and that she continued to be placed in the cheeking-heads position during that time.  Escobar also asserts that she complained again in November 2003 and July 2004 and that she was still being placed in the cheeking-heads position disproportionately thereafter.  After Escobar complained in September 2003, Zamzow's conduct did improve during the subsequent three-month period.  Escobar does not appear to be contending that she was retaliated against, nor could she, for those three months when the situation improved.

the job duties constituted retaliation).  There is evidence that female employees who

complied with Zamzow's harassment were not disproportionately kept in the

cheeking-heads position.  And there is evidence that Escobar was sometimes not allowed

to tell her side of the story when reporting to Human Resources, that Zamzow's patience

was short with Escobar when she did complain, and that Human Resources told Escobar

that if she did not like it she could quit.  The Court believes that these facts, if proved,

establish a pattern of retaliation taken in response to Escobar's complaints about

Zamzow's behavior.

As to Escobar's second allegation of retaliation, Swift admits that when Escobar

sought three days off, Human Resources told Escobar that she would have to clear it with

her supervisor, Zamzow.  Viewing the evidence in the light most favorable to Escobar,

which includes the evidence supporting the contention that Escobar did in fact notify

Swift on several occasions of Zamzow's sexual harassment, the Court finds that under

such circumstances, sending Escobar to Zamzow could constitute an adverse action, and

such adverse action could be directly related to Escobar's prior complaints.[12]  Further,

such action by Swift, at a minimum, creates a genuine issue of material fact as to whether

Escobar was constructively discharged.

Because genuine issues of material fact permeate Escobar's retaliation claim, the

Court denies Swift's motion with respect to this claim.

---

[12]     It is irrelevant whether Escobar asked for the days off for personal reasons or to
seek legal advice.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED THAT**:

1.      Plaintiff's Motion for Partial Affirmative Summary Judgment (Doc. No. 20) is **DENIED**.

2.      Defendant's Motion for Summary Judgment (Doc. No. 28) is **DENIED**.

3.      Counts III, IV, and VII of the Complaint are **WITHDRAWN** and **DISMISSED WITH PREJUDICE.**


Dated:  January 2, 2007                  s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         Judge of United States District Court